### STATE ex JUDD v HUBER et

Ohio Appeals, 1st Dist, Hamilton Co

No 4091. Decided June 27, 1932

Ralph B. Kohnen and I. L. Huddle, Cincinnati, for Relator.

John D. Ellis, City Solicitor, Cincinnati, and John J. O'Donnell, Ass't City Solicitor, Cincinnati, for Respondents.

HAMILTON, J.

Section 47 of the By-Laws and Regulations, governing the Police Relief Fund, provides for pensions to widows and children of deceased members of the police department, and reads in part as follows·

"To such widow, while unmarried, the sum of $50.00 per month; * * *"

It appears that Lucius Judd was a member, in good standing, of the Police Force of the City of Cincinnati from the 17th day of July, 1885 until the 3rd day of December, 1912, at which time he was retired.

It is not denied that at the time of Judd's death, relator was his widow.

It is claimed that on April 2nd, 1902 relator and Lucius Judd agreed to assume toward each other the relationship of husband and wife, and that they lived together

as such until the death of Lucius Judd, which occurred November 20th, 1926. Judd, as above stated, retired from the police force in 1912.

It appears that on the 13th day of February, 1920, a ceremonial marriage was entered into between Lucius Judd and the relator. This, of course, was some eight years subsequent to his retirement from the Police Force, and if this is the only marriage, she, as such widow, under the provisions of the pension act, would not be entitled to the pension. If there was a common law marriage, recognized under the law, existing prior to 1912, she would be entitled to the pension.

As to the common law marriage:—We find it deducible from the evidence that in 1902 the relator and Lucius Judd did assume intimate relations. It is also in the evidence that for many years following Lucius Judd maintained his home with his mother and his sisters, at a different address from that of the relator. The relator during these years had rooming houses at different locations, and that Judd went back and forth from her rooming houses to the home of his mother and sisters in another location. Judd, in voting, gave his residence as the home of his mother. While this one fact is not conclusive, it has a bearing on the case.

The direct evidence as to the holding out of the relationship of husband and wife appears from the evidence of Dr. Aratus. His testimony is to the effect that he was called by Judd to visit the relator at her rooming house, and when he went to call, Judd stated: "My wife is in there," or words to that effect.

Other witnesses testified that they visited Judd and the relator in a two-flat house, one apartment of which was occupied by Judd and the relator, and the witnesses for the relator occupying the other; that they played cards together, and they always took them to be husband and wife, that they appeared so to them.

This is about the full strength of the evidence tending to show the existence of a common law marriage.

Relator did visit Judd's sisters, and possibly attended his mother's funeral, but nothing is stated in that regard concerning the common law marriage. It is but an incident which might have a tendency to corroborate any direct evidence of a common law marriage.

Captain Dunning, of long years a member of the Police Force, and a member of the Board of Trustees of the Police Relief Fund, testified that he knew Judd very well; that he saw him every day and talked with him; that he was a neighbor of his, Judd living at the northwest corner of Seventh and Baymiller Streets; that this was the residence of his mother and sisters. Dunning states that he lived a half a block from the Judd home, (referring to the Seventh and Baymiller home) that he passed Judd's house every day going to and from work; that this covered the period from 1902 to 1913; that he never knew Judd to be a married man, nor hold out any one to the public as his wife. He states that he would pass the Judd home, at Seventh and Baymiller, and see Judd and his sisters sitting on the front steps; and that he would stop and talk.

Henery Vennemann, testified that he became an officer in the Police Department of Cincinnati in 1897; that he held the position of Patrol service, chief of Detectives office for twelve years, was desk sergeant of the First District, and during the last five years of his service was with the Ohio Humane Society. He testified that he knew Lucius Judd very well; that he was stationed in the same station as Judd, Patrol Four; that Judd at that time drove the Black Mariah, that transferred prisoners from the City Hall to the Workhouse; that he was well acquainted with Judd; that he had heard Judd had been married, but that his wife was dead. He states from the time that he knew Judd in 1897 until Judd retired from the Police Force in 1912 he never knew him to pose as a married man, but that after his retirement he met him on Elizabeth Street. Vennemann states that he was walking home, and Judd said "I live up here," and Vennemann said he looked in and saw the relator, and he said: "Are you living here with that woman?" That Judd answered "Yes," and that he remarked to Judd: "You are a pensioner and you are not living as a law abiding citizen should." Vennemann said "Why don't you get married to her?" Judd's answer was: "I'll think that over." Vennemann said that relator had run a house of prostitution on Longworth Street, and as a police officer he had some knowledge of the running of that house. He said he met Judd long after he had retired from the force, when Judd said to him: "We got married," and that the license was in the trunk. He states that this was long after his retirement from the force.

So it appears that the parties did not recognize a common law marriage as existing, and did not rely on it, in view of the

fact that in 1920 they procured a license and had a ceremonial marriage.

That the relator did not consider any marriage prior to the ceremonial marriage is indicated by the following letter:

"Cincinnati, Ohio, 11-29-26.
Mr. Robert L. Dunning,
Secretary, Police Relief Ass'n.
Sir:

I herewith make application for Relief money $300.00, due me through the death of my husband, Lucius A. Judd, retired from Cincinnati Police Dept.

I was married to Lucius A. Judd after his retirement from the Dept.

Hoping this will meet with your approval, I am,

Respectfully,
JENNIE JUDD,
217 Carpenter St.,
Cincinnati, Ohio."

Emphasis should be laid on the statement in the letter that: "I was married to Lucius A. Judd after his retirement from the Dept." Upon that statement, the Board of Trustees of the Fund made an allowance to her as widow of Lucius Judd under favor of §40 of the By-Laws and Regulations of the Police Relief Fund, which provides in substance:

"40. On the death of a member of the Police Force, except to beneficiaries under the pension law, the sum of three hundred dollars ($300.00) shall be appropriated by the Board of Trustees, to be paid to the widow of the deceased, * * *."

We have not undertaken to state all the evidence pro and con. The character of the evidence is suggested.

Our conclusion is that the weight of the evidence is against the existence of a common law marriage prior to the retirement of Judd in 1912. While common law marriages are recognizable in Ohio, it was incumbent upon the relator to prove the existence of same, by proof of the agreement to such marriage when entered into, the holding out to the public that they are man and wife, and the living together as such. While the relator has introduced some evidence tending to establish these requirements, we are of opinion that the relator's case has been overthrown by the rebuttal evidence. The ceremonial marriage and the statement in the letter above quoted, furnishing strong, if not, conclusive evidence, disproving a common law marriage.

The writ is refused.

ROSS, PJ, and CUSHING, J, concur.